```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   ROBERT F. BOOTH TRUST and      )
     RONALD GROSS, derivatively on  )
 4   behalf of nominal defendant    )
     SEARS HOLDINGS CORPORATION,    )
 5                                  )
                  Plaintiffs,       )
 6                                  )
       v.                           )  No. 09 C 5314
 7                                  )
     WILLIAM C. CROWLEY, EDWARD S.  )
 8   LAMPERT, STEVEN T. MNUCHIN,    )
     RICHARD C. PERRY, ANN N. REESE,)
 9   KEVIN B. ROLLINS, EMILY SCOTT  )
     and THOMAS J. TISCH,           )  Chicago, Illinois
10                                  )  July 9, 2010
                  Defendants,       )  10:00 a.m.
11                                  )
       and                          )
12                                  )
     SEARS HOLDINGS CORPORATION,    )
13                                  )
                  Nominal Defendant.)
14
                     TRANSCRIPT OF PROCEEDINGS
15            BEFORE THE HONORABLE RONALD A. GUZMAN

16
     APPEARANCES:
17
     For the Plaintiffs:       VIANALE & VIANALE LLP
18                             BY:  MR. KENNETH J. VIANALE
                               2499 Glades Road
19                             Suite 112
                               Boca Raton, Florida  33431
20                             (561) 392-4750

21                             SARRAF GENTILE LLP
                               BY:  MR. RONEN SARRAF
22                             485 Seventh Avenue
                               Suite 1005
23                             New York, New York  10018
                               (212) 868-3610
24

25
```

```
 1    APPEARANCES:   (Continued)

 2    For the Plaintiffs:        SUSMAN HEFFNER & HURST LLP
                                 BY:  MR. MATTHEW TODD HURST
 3                               Two First National Plaza
                                 Suite 600
 4                               Chicago, Illinois  60603
                                 (312) 346-3466
 5
      For the Defendants:        SONNENSCHEIN, NATH & ROSENTHAL, LLP
 6                               BY:  MR. CHRISTOPHER Q. KING
                                      MR. RAMJI B. KAUL
 7                               233 South Wacker Drive
                                 Suite 7800
 8                               Chicago, Illinois  60606
                                 (312) 876-8000
 9
      For the Nominal Defendant  SCHOPF & WEISS LLP
10    Sears:                     BY:  MS. KRISTEN ELIZABETH HUDSON
                                 One South Wacker Drive
11                               28th Floor
                                 Chicago, Illinois  60606
12                               (312) 701-9300

13    Court Reporter:            NANCY C. LaBELLA, CSR, RMR, CRR
                                 Official Court Reporter
14                               219 South Dearborn Street
                                 Room 1222
15                               Chicago, Illinois  60604
                                 (312) 435-6890
16                               Nancy_LaBella@ilnd.uscourts.gov

17

18

19

20

21

22

23

24

25
```

1      (Proceedings heard in open court:)

2           THE CLERK:  09 C 5314, Robert F. Booth Trust v.

3  Crowley.

4           MR. VIANALE:  Good morning, your Honor.  Kenneth

5  Vianale on behalf of the plaintiffs.

6           MR. SARRAF:  Good morning, your Honor.  Ronen Sarraf

7  on behalf of the plaintiffs.

8           MR. HURST:  Good morning, your Honor.  Matt Hurst,

9  also on behalf of the plaintiffs.

10           MR. KING:  Good morning, your Honor.  Christopher

11  King and Ramji Kaul on behalf of the director defendants.

12           MS. HUDSON:  Good morning, your Honor.  Kristen

13  Hudson on behalf of Sears Holdings Corporation.

14           MR. FRANK:  Theodore H. Frank, pro se on behalf of

15  myself.

16           THE COURT:  Okay.  We have requests for final

17  approval of the settlement and a memorandum of law in support

18  of plaintiffs' motion for attorneys' fees.

19           Do you wish to be heard?

20           MR. VIANALE:  Yes, your Honor.

21           Your Honor, the two issues before the Court, as you

22  mentioned, are fairness and adequacy of the settlement and the

23  reasonableness of the attorneys' fees request.

24           To begin with, your Honor preliminarily approved

25  this -- the settlement of this derivative action on May 11th.

1    You directed that notice go out to the shareholders of Sears

2    Corporation.  We have an affidavit from the Garden City Group

3    laying out the notice that was given to the shareholders.

4    Notice went to 57,565 shareholders of record, copies of the

5    notice, on June 1.  Thereafter, another group of shareholders

6    received notice.  50,393 notices went out a second time; that

7    is, to individuals who held their stock in street name and

8    nominee name.  A total of 107,958 copies of the long form

9    written notice that the Court approved went out pursuant to

10   your Honor's preliminary approval order and on the time scheme

11   set out in that order.

12          In addition, a Web site was set up by the company

13   explaining the details of the settlement.  And a press release

14   was issued on June 4th to all shareholders of Sears advising

15   them of the settlement and allowing them to obtain a written

16   copy of the notice by simply clicking and downloading.

17          As a result of the notice program, there are only

18   seven objections to the settlement.  We don't think there

19   was -- I'd like to deal with the notice issue because we have

20   an objector here in court who is questioning the notice, and I

21   want to -- I'd like to deal with that.  Mr. Frank is at the

22   far end, who has made an objection on notice and --

23          THE COURT:  Well, why don't we leave that and let him

24   speak first and then you can respond to his objection rather

25   than have you anticipate what he's going to say.

 1          MR. VIANALE:  Okay.  He's -- that's fine, your Honor.

 2          Let me say first that we believe that the notice

 3   program was more than adequate in this case for two important

 4   reasons.  First of all, this is a derivative, not a class

 5   case.  And your Honor directed more notice than the

 6   Constitution even requires in a derivative case.  And the

 7   question was whether or not the notice was sufficient to flush

 8   out whatever objections might reasonably be expected from the

 9   settlement.

10          The number of objections that we have received is

11   minuscule.  In fact, it's 1/100th of 1 percent of the

12   shareholders.  And the weight of those objections I'd like to

13   deal with later.  But they're not exactly the weightiest of

14   objections.  And under the case law, I think that the notice

15   program was more than adequate.

16          THE COURT:  The notice that went out to the

17   shareholders though doesn't tell them what the actual

18   attorneys' fees are going to be in the case, does it?

19          MR. VIANALE:  It gives them a maximum.

20          THE COURT:  It gives them a maximum, but they don't

21   know if it's going to be $5 or 900,000, right?

22          MR. VIANALE:  That's up to the Court.  We couldn't

23   anticipate that.

24          THE COURT:  Right.  But I'm saying they don't know

25   that when you get the notice.  So if they're objecting to the

1     attorneys' fees, we'll never know, right?

2          MR. VIANALE:  They couldn't know unless your Honor

3     rules.

4          THE COURT:  Right.  Right.

5          MR. VIANALE:  So that -- in other words, that would

6     be true in every case in which there's a class action or a

7     derivative settlement where the Court must --

8          THE COURT:  In most cases.  In most cases.  Sometimes

9     the attorneys' fees are actually fixed in advance and included

10    in the notice.  But it would be true in most cases, correct.

11         But the point I'm making is that the notice -- the

12    fact that there was no objection to the notice may be a very

13    valid point with respect to all of the other portions of the

14    settlement agreement but not necessarily so with respect to

15    the attorneys' fees because the notice didn't include the

16    actual amount of the attorneys' fees.

17         MR. VIANALE:  Well, but I think that that is -- that

18    actually argues in favor of the settlement, not against -- or

19    in favor of the attorneys' fees provision because if they know

20    what the maximum is that we're asking for and there are no

21    objections or very few objections to that, then if there was a

22    lesser amount that was awarded by the Court, one wouldn't

23    expect any objections.

24         THE COURT:  That's one way to look at it.

25         MR. VIANALE:  Besides the notice -- the notice

1    advised the shareholders of the following:  The maximum amount

2    that we're asking for, which was 925,000 --

3         THE COURT:  Well, it said the maximum amount that

4    Sears would not object to, I think is what the notice said,

5    correct, not what you're asking for?

6         MR. VIANALE:  That's correct, your Honor.

7         THE COURT:  Go on.

8         MR. VIANALE:  So there is a possibility that -- I'm

9    trying to understand what your Honor is suggesting.

10         THE COURT:  Well, what I'm trying to say is that the

11   shareholder that receives that notice could say to himself,

12   well, maybe they're only asking for $50,000.  I don't know.

13   How can I object?

14         MR. VIANALE:  Well, we have -- if we had told the

15   shareholders that we would ask for up to $925,000 and that

16   Sears would not object to that amount, we've given them the

17   outside maximum of what it is we would ask for and what Sears

18   would object to.  And the Court -- in other words, we've told

19   them more about the attorneys' fees than they would receive if

20   they had the actual number.  It's actually more prejudicial to

21   the application for attorneys' fees than it would be if we had

22   an actual number that was less than $925,000.  We gave them

23   the absolute maximum of what we would ask for, the maximum

24   that Sears would tolerate.

25         In any event --

1          THE COURT:  I don't interpret it that way, but go

2     ahead.

3          MR. VIANALE:  Your Honor, with respect to the

4     settlement, what is the settlement?  First of all, we believe

5     that the action achieves almost everything that it sought out

6     to do and, therefore, the settlement is more than fair,

7     reasonable and adequate.

8          Crowley -- Mr. Crowley was one of the two people that

9     we sought to have removed from the board, Mr. Crowley and

10    Ms. Reese.  Mr. Crowley is stepping down.  He's not going to

11    be a director.  He's not going to be an officer.  We've

12    achieved everything we possibly could with the settlement with

13    respect to Mr. Crowley.

14         With respect to additional -- the settlement provides

15    for an additional director, an independent director --

16    somebody having nothing to do with ESL, which is the

17    controlled shareholder in this case -- is going to be added to

18    the board by the next election.

19         With respect to Ms. Reese and Mr. Lampert, they are

20    going to both be subject to a firewall which prevents them

21    from discussing the operations of -- with respect to Ms. Reese

22    the women's apparel and footwear business and with respect to

23    Mr. Lampert the auto parts and auto repair businesses.  With

24    respect to Mr. Lampert, that is relief that we couldn't

25    have -- could not have obtained in this case other than

1    through the settlement.

2         And finally, your Honor, the company has agreed to

3    review its corporate governance and enhance it if necessary to

4    assist in not having these kinds of violations in the past.

5         But the real thrust here of the settlement and its

6    value is the fact that Mr. Crowley is gone.  And that's half

7    of the relief that we could have obtained if we had fought and

8    won on every single issue.

9         And we have laid out, your Honor, the various factors

10   that courts look at when considering the fairness of a

11   derivative settlement and a class action settlement, which are

12   much the same in terms of the factors looked at.  And we've

13   laid those out in great detail in our papers.  I'm not going

14   to go through every one of them, but I'd just like to look at

15   a couple of the factors that are laid out in the Armstrong

16   case, which is from the Seventh Circuit, 1980.  It lays out

17   six factors.

18        The most important factor -- although the courts say

19   that you have to look at this in a mix, they also say what is

20   the most important factor in the mix; and that is the strength

21   of the case that the plaintiffs had versus the benefit of the

22   settlement; what were the strengths and weaknesses of the case

23   versus what one obtained.

24        And here, we believe -- the plaintiffs believed that

25   they had a strong case under Section 8 of the Clayton Act.  We

1   believed that these directors were interlocking directors

2   within the meaning of the Act.  They sat on boards of

3   competing corporations.  That's why we sought to remove them.

4   But there were impediments.  There were real possibilities

5   that along the way we would have gotten rulings that would

6   have dismissed the case.

7           And one of the main things we've highlighted in our

8   brief is the defense that was raised by the defendants under

9   the statute itself which is the so-called de minimis defense.

10  And that defense says that if the competing sales of the

11  companies at issue is less than 2 percent of their annual

12  revenues, the statute says that it doesn't apply; you can

13  interlock all you want.

14          And in this case, we alleged that Sears sold women's

15  clothing and sold men's clothing and sold children's clothing

16  and sold jewelry, it sold accessories; and we said that Jones

17  Apparel sold women's clothing, jewelry, accessories, handbags,

18  children's clothing, footwear.  We said, okay, there is an

19  interlock here.

20          The same thing with respect to Mr. Crowley's presence

21  on the board.  Sears sells auto parts.  Sears has an auto

22  repair business.  Well, so does AutoZone and AutoNation.

23          When you get down to the nitty-gritty of looking at

24  whether or not the de minimis defense applies, it was an

25  extremely complicated task.  It was very fact intensive.  And

1    the company had a number of defenses, let's just say with

2    respect to AutoZone and AutoNation.  The company took the

3    position that, yeah, AutoZone sells auto -- all sorts of auto

4    maintenance products and so does Sears, but AutoZone is a much

5    bigger company.  It sells a much longer line of products.

6    Sears is much smaller than that.  And they wound up defending

7    on the ground that we're talking only about three major

8    products that Sears sells that AutoZone sells, which were -- I

9    mean, when you get down to the level of detail, which were

10   basically oil, transmission fluid and brake fluid; and that's

11   when they said, okay, you want to add up those sales?  Because

12   that's the real de minimis category we're looking at.  We took

13   a much broader view of the case.  We think that this would

14   have been -- we think that the Court would have accepted our

15   view.

16        The Seventh Circuit has a case, Protectoseal case,

17   which says you shouldn't get into this kind of nitty-gritty

18   when you're talking about the prophylactic statute that

19   Section 8 is; that that may be an appropriate way to analyze

20   things under Section 7 when you're talking about a merger of

21   companies and they have similar product lines.  And we believe

22   we would have prevailed on that.  But, nevertheless, those

23   cases predated the 1990 amendment to the statute which brought

24   in these de minimis defenses.  And I believe that the Court

25   would have been flooded with a raft of product and sale

 1    information from the defendants and experts who were going to

 2    take the stand and say these are the only products that these

 3    two companies compete under or compete on, et cetera.  And if

 4    we got bogged down into that, it would be very, very

 5    expensive.  There were very, very few legal precedents

 6    available to give anybody guidance.

 7          The statute, as your Honor commented at one prior

 8    hearing, you know, it doesn't have a lot of case law under it

 9    and certainly none since 1990.  So rather than get into that,

10    creating not only litigation issues before this Court but

11    perhaps before the appellate court, the settlement achieves

12    most, if not all, of the major objectives that the lawsuit

13    had, without the expense and the time and the risk of that

14    kind of litigation under Section 8.

15          In a normal settlement -- in any other settlement, if

16    we were dealing, let's say, with money, if we came in to court

17    and we said we have a settlement and we were seeking a hundred

18    million dollars tops, that's all we think we would have gotten

19    from the jury if we won on everything, and we came in and we

20    said we got $50 million, there's lots of case law that said

21    you did a pretty good job to get that much.

22          Well, here, we sought to get Ms. Reese and

23    Mr. Crowley off the board.  We succeeded in getting

24    Mr. Crowley off the board.  We got 50 percent just on the face

25    of it of all the relief we possibly could have if we had won

1    on all issues.  And we think there were lots of risks on those

2    issues.

3         So when you look at the strength of the case and the

4    defenses that they would have raised and the expense to the

5    company and to the plaintiff and to the Court's resources

6    versus what we achieved, we think that factor alone weighs

7    very, very heavily in favor of the settlement.

8         With respect to the other factors, I touched on the

9    complexity and the length and the expense of the litigation

10   and the trial which would have adhered to this type of a case,

11   particularly with expert testimony.

12        But let me just deal with the issue of the amount of

13   opposition to the settlement and the presence of collusion in

14   reaching the settlement.  There's no collusion here.  Both

15   sides litigated this at arm's length, at length, adversarial

16   from the very first.  There's no indication here that there's

17   anything but what the eye sees.

18        And, secondly, as proof of that, courts have said,

19   well, is the attorneys' fees provision here somehow linked to

20   the settlement.  It isn't.  If your Honor approves the

21   settlement and not the attorneys' fees provision, the

22   settlement goes through.  That's some indication that there's

23   no collusion among the parties here.

24        With respect to the amount of opposition to the

25   settlement, as I said earlier, 107,500 some-odd notices went

1    out.  You've only got seven objections.  It's 1/100th of 1

2    percent of the shareholders here.  It's a tiny, tiny number.

3    But put that aside.  What is the weight of the opposition?

4    The number of the opposition is minuscule.  But what is the

5    weight of the opposition?

6            Well, let's look at it.  You got Mr. Orlick, who says

7    he should be given two and a half million dollars as punitive

8    damages because he's got some beef with Sears.  He won't tell

9    anybody what it is.  And it apparently has a case number

10   beginning with 04.  Or a claim number.  It's not even a

11   lawsuit.  It's a claim number.  If it has anything to do with

12   2004, that predated anything that happened in this case.  So

13   it couldn't possibly have anything to do with this case.

14           THE COURT:  You don't think he's entitled to his two

15   million?

16           MR. VIANALE:  I do not.

17           Mr. James raises a question with respect to the scope

18   of the release.  He doesn't say what it is.  He just says,

19   here's the release, I object.  Okay.  But look at the release

20   in this case.  This release only releases claims with respect

21   to this case.  It only releases claims of the company.  It's

22   not even individual claims.  It's individual to the extent

23   that they may be derivative, but it doesn't release individual

24   claims.  And it only has to do with the narrow facts of this

25   case, what was in the complaint and what might have been

1    brought in the complaint.  There's really no issue there.

2         The other shareholders raise the issue -- they say,

3    well -- one shareholder says they should both be off the

4    board.  That's one objection.  They should both be off the

5    board.  Well, it doesn't really explain the fact that Crowley

6    is off the board.  One of them is.  It seemed unclear that the

7    objector didn't seem to understand that one of them is off the

8    board.

9         With respect to Ms. Reese, this is a compromise.

10   Yeah, I would have loved to have gotten them both off the

11   board and come in and say we achieved every single goal.  We

12   didn't.  But we achieved most of it.  She's going to be on the

13   board.  That's not an impediment to the settlement here.

14   She's going to observe a firewall which prevents her from

15   taking part in discussions about the operations of the women's

16   apparel and footwear business.  Does that help to achieve the

17   goals of Section 8?  Yes, it does.  What is that?  To avoid

18   anti-competitive activity.  That's the point.  And it doesn't

19   remove her, but it makes it very clear that the company is

20   going to observe, I think, the strictures of Section 8.

21        So your Honor had raised this at one earlier time

22   when we came for preliminary approval, and you had mentioned

23   how can we leave her on the board; it's not part of the

24   statute; the statute doesn't allow for what you're talking

25   about, a firewall.  And the Seventh Circuit has cases on this

1   point.  We cited two of them in our brief, the Armstrong case

2   and the Isby case.  And unless the -- the Seventh Circuit has

3   said, look, settlements involve parties compromising, not

4   getting everything that they want.  The only impediment to a

5   settlement is if an illegality is enforced or initiated by the

6   Court by approving the settlement and that illegality appears

7   on the face of the settlement agreement.  There's no

8   illegality appearing on the face of the settlement agreement

9   here.

10          As I said before, we had a hard road to hoe to prove

11  the case and to ultimately win on all the issues, given the

12  fact the statute affords the defendants a de minimis defense.

13  So this settlement is no different than any other; that is,

14  you don't get everything you want.  And -- but the settlement

15  still has a lot of benefits that make sense to approve.

16          Your Honor, if I could go on now to Mr. Frank's

17  objection.  He objects, saying that the settlement has no

18  value; the settlement makes the company worse off than it was

19  before.  He's in the opposite direction from the other

20  objector, saying that both of them ought to be off.  He says,

21  no, neither of them ought to be off; and this only led to

22  director turnover, quote/unquote.

23          Well, here's the response to that:  The company

24  itself has said in the settlement that the settlement is

25  valuable.  But suppose you look at that and you say, well,

1    that's because they're settling and they just want to get the

2    case over with, so you can't trust that.  Okay.  That's a

3    statement when they had a motive to not be fully truthful.

4    But look at their Web site.  Their Web site has been up for

5    years.  And their Web site contains their own corporate

6    governance guidelines that they set out, they tell their own

7    employees.  And they tell their employees that it's very

8    important for company employees to avoid -- to adhere to the

9    antitrust laws.  Why?  Because if the company doesn't adhere

10   to the antitrust laws, it can get into trouble; it can cause

11   the company to be investigated; it can cause the company to

12   have to expend money to defend itself; and worst of all, it

13   can hurt the company's reputation.  We've put that in our

14   brief.  We've cited it from their Web site.  That is an

15   important benefit of the settlement.  That's why the

16   settlement is valuable.

17        The idea that the company is worse off because it's

18   now complying with Section 8 and recognizes the utility of

19   taking steps to comply in the future with Section 8 doesn't

20   make any sense.  Why would a company want to expose itself to

21   liability when it could, through this settlement, reduce that

22   risk or eliminate it entirely with respect to Mr. Crowley?

23        The notion that this has only led to, you know,

24   director turnover -- that was the word that Mr. Frank used --

25   directors only sit on the board for terms of one year.  It's

 1    not a lifetime appointment.  It's not an appointment during

 2    good behavior like a federal judge.  This is a one-year term.

 3    So the idea that there's turnover is inherent in the bylaws

 4    and the articles of incorporation.  That's the way the company

 5    runs.

 6            Mr. Frank has also said that this was a quote/unquote

 7    strike suit and that the plaintiffs' lawyers were

 8    unscrupulous.  You know, your Honor, you -- you reviewed this

 9    case.  You ruled on a motion to dismiss.  You have all the

10    facts to decide whether or not you think this was a strike

11    suit.  We've been in front of your Honor a number of times.

12    If you think we were unscrupulous or that this was a strike

13    suit, you'd be the best person to know.  We don't think it was

14    either of those things.

15            The case was -- the case was researched carefully

16    before we brought it, both on the law and the facts.  It was

17    litigated professionally.  There's nothing unscrupulous about

18    what we did, and it is certainly not a strike suit.  This

19    company has never claimed from day one that these allegations

20    were meritless.  If anything, this is -- the case has shown

21    it's a very close case.  That's why both sides have agreed to

22    settle it.

23            Your Honor, I'd like to go on to the attorneys' fees

24    request.  With respect to attorneys' fees, we're asking for

25    $925,000.  That amount includes a request for expenses of

1    approximately 30,000 -- $31,000.  So we're effectively asking

2    for $893,000 in attorneys' fees.

3            We've laid out the law in our papers.  The Seventh

4    Circuit takes a market approach.  The Seventh Circuit says we

5    have to discern as closely as possible what would be the

6    market award, what would be the market price for the legal

7    services.

8            In another case, the Seventh Circuit said the

9    reasonable attorneys' --

10           THE COURT:  How do you do that in a shareholders'

11   derivative action?

12           MR. VIANALE:  I'm sorry?

13           THE COURT:  How do you do that in a shareholders'

14   derivative action?

15           MR. VIANALE:  It would ordinarily be difficult,

16   except that here we have an actual market transaction.  We

17   have a market price.  What -- the cases say what -- the lawyer

18   should get what he would have gotten in the way of a fee in an

19   arm's-length negotiation had one been feasible.  That's what

20   we had.

21           THE COURT:  An arm's-length negotiation with who?

22   Not with your opponent.  With your client.

23           MR. VIANALE:  But the client is the company.  This is

24   a derivative action.  It's not a class case.

25           THE COURT:  Sure.  But the problem is that the

1    company is what?  The shareholders.  It's not the directors.

2    It's not the officers.  It's not the accountants.  It's not

3    even the people that work on the assembly line, if Sears still

4    has one.  It's the shareholders.  So how do we know what the

5    shareholders would have been willing to pay you out of their

6    own pockets -- which is what company money is --

7            MR. VIANALE:  The company --

8            THE COURT:  -- to do this?

9            MR. VIANALE:  But it only -- I don't -- with respect,

10   your Honor, I don't think that's correct.  I think that the

11   company is owned by shareholders.  The company itself is a

12   separate legal entity that has a board of directors and

13   management that makes the decisions to --

14           THE COURT:  I'm aware of the fact that corporations

15   are separate legal entities.  Whose money --

16           MR. VIANALE:  But management --

17           THE COURT:  -- is paying your fee?

18           MR. VIANALE:  The company, I believe.

19           THE COURT:  Well --

20           MR. VIANALE:  But who has to manage -- in other

21   words, there has to be a manager for the company who

22   manages --

23           THE COURT:  There is.

24           MR. VIANALE:  -- on behalf of the shareholders.

25           THE COURT:  There is.  But my question to you goes to

1  who is it that you have to have this arm's-length negotiation

2  with to determine what an appropriate fee for you would be.

3         MR. VIANALE:  If it isn't the company, it couldn't be

4  anybody else because how could you have a negotiation with

5  shareholders?

6         THE COURT:  Well, do the shareholders have any say in

7  it?  Should their determination be considered?  They're part

8  of the company.  They're some part of the company, right?

9  Still I think even today the shareholders are considered to be

10  some at least miniscule part of the corporation, aren't they?

11         MR. VIANALE:  I agree, your Honor, most definitely.

12  And they are being heard.  But if your Honor's question is who

13  should the plaintiffs' lawyers negotiate with, it has to be

14  the company.  Should the shareholders have a say?  Of course.

15  That's why they got notice, and some objected to it.  Yes, no

16  question about it.

17         THE COURT:  Why don't we send them a questionnaire

18  asking them how much they would have been willing to pay you

19  to do this litigation?

20         MR. VIANALE:  Because they're not -- they are not in

21  a position to really judge that.  Management has the expertise

22  to make that judgment.  If you did that on every corporate

23  issue that Sears ever had, you'd have chaos.

24         THE COURT:  I don't want to do it on every corporate

25  issue.  I want to do it to try to establish what an

1  arm's-length transaction with your clients would be in this

2  type of a case.  Why don't we do that?

3          MR. VIANALE:  First of all, I would say it's

4  unprecedented.

5          THE COURT:  So?

6          MR. VIANALE:  Well, because I think that the case law

7  makes it clear that in something like this, the shareholders

8  are represented by experts, who is really management.  The

9  shareholders --

10          THE COURT:  So their direct say shouldn't be --

11          MR. VIANALE:  How do they know --

12          THE COURT:  -- taken into account?  I just want to

13  know.  Are you saying that their direct say should not be

14  taken into account?

15          MR. VIANALE:  I didn't say that, your Honor.

16          THE COURT:  Okay.

17          MR. VIANALE:  I don't mean that.  I think that their

18  statements should be taken into account with respect to --

19          THE COURT:  So why don't we get their statements?

20  Why don't we find out from them what they think?

21          MR. VIANALE:  They don't -- because they don't have

22  the expertise in hiring lawyers that the corporation does.

23  They have no idea what legal fees cost.  You have a

24  shareholder saying you should be paid $1.  Okay.  The

25  management of a corporation like this, which regularly retains

1    counsel, is in a very good position to know what that costs.

2            THE COURT:  The problem is that the management, of

3    course, is another portion of the corporation.  But all of

4    these different segments of the corporation don't have the

5    same particular interests.  Sometimes their interests are in

6    conflict.  The management's interest in resolving this case

7    may be different from the shareholders' interest.  The

8    management's interest in paying you money for this case to go

9    away may be different from the shareholders' interest.  The

10   shareholders may not have wanted you to institute this lawsuit

11   in the first place even though you're here representing them.

12           I just don't understand why you would object to

13   having the shareholders put in their opinion, their two cents,

14   as to what an appropriate fee would be, what they would be

15   willing to pay you to conduct this litigation, of what value

16   was it to them, the shareholders of the corporation, the

17   people who own the corporation, the people whose money is

18   invested in the corporation.  Why shouldn't they be allowed to

19   have a say-so?  What was the value to them of what you

20   accomplished, this more than 50 percent success that you've

21   had in this lawsuit?  What's the value to them?  Isn't that

22   part of the determination of what the market will bear, the

23   market analysis for what your services are worth?

24           MR. VIANALE:  I don't -- no, because -- respectfully,

25   no, your Honor, because how do they have any basis to know

1   what we did in the case?

2          THE COURT:  I mean, if that's the case, if the

3   shareholders are incompetent, then what you're really saying

4   is that their say should not be heard, their direct say should

5   not -- they should only be heard through the officers of the

6   corporation.  And in a shareholders' derivative action,

7   there's a certain tension there, isn't there?

8          MR. VIANALE:  There may be a certain tension, your

9   Honor.  But I don't know how, you know, thousands of

10  shareholders who have limited touch with this case would be

11  able to judge our fee application.  That's really what we're

12  talking about here.  For a shareholder to make the

13  determination that you're talking about on a market basis like

14  we did with the company, they would have to know a lot of

15  things.

16         THE COURT:  No more than they have to know when they

17  vote on directors.  And they do that every year, don't they?

18         MR. VIANALE:  Well, they get proxy materials at least

19  with that.

20         THE COURT:  Excuse me?

21         MR. VIANALE:  They get proxy materials with that.

22  They get the whole background of who the director is and --

23         THE COURT:  Well, give them the background on the

24  case, the same background you've given me.

25         I'm, frankly, astounded that you would take the

1    position that shareholders are too ignorant to have an opinion

2    on this that's worth listening to.

3              MR. VIANALE:  No, I didn't say that, your Honor.

4              THE COURT:  Sure you did.  You said how could they

5    possibly know.  They have no basis.  They have no way.  Only

6    the directors can know.

7              MR. VIANALE:  No, they don't have any facts in front

8    of them.  How can they know?  This company had all the facts

9    in front of it.  It had the complaint.  It had what we did.

10   It was here in court.  It had its lawyers.  I'm just saying,

11   how are you going to educate the shareholders to the point

12   where they have an opinion that means anything here?

13             THE COURT:  Well, that's why we gave them the notice

14   of the settlement, right?  So they could have enough

15   information to make a rational determination.  Wasn't that

16   process worth something?

17             MR. VIANALE:  It is, your Honor.  If you want us to

18   notify the class and ask them what they think they should pay

19   us in our attorneys' fees, we can do that.

20             THE COURT:  Before we do that, here's what I'd like:

21   I'd like first an explanation from you of how you reached your

22   multiplier in this case.

23             MR. VIANALE:  Well, the multiplier was 1.394, your

24   Honor.  It's well below --

25             THE COURT:  How did you calculate it?

1          MR. VIANALE:  Our lodestar in the case was $641,000.

2    The company said it wouldn't object to a fee request beyond

3    925,000.  We could have come in, I guess, and asked for more

4    than $925,000.  We did not do that.  So we're asking for a

5    modest multiplier.

6          THE COURT:  It appears to me -- first of all, you're

7    assuming that a multiplier is applicable in every case.  I

8    don't assume that.

9          It appears to me that the multiplier you're asking

10   for in this case was not arrived at by looking at the factors

11   that the case law requires.  Rather, you reached the amount

12   you wanted to charge and you determined what the multiplier

13   ought to be to take your actual hourly charge, your actual

14   lodestar, to that amount.  And that's not appropriate.  It's

15   not right.  It's not according to the case law.  It's totally

16   inappropriate.  That's what it appears like to me.

17         In addition to that, the materials you have submitted

18   in support of the attorneys' fees are, in my opinion, woefully

19   inadequate.  Give us the actual documents, not your summary of

20   the documents.  Give us your actual hourly calculations, the

21   time sheets, the explanations, all of that.  We'll look at it

22   and determine whether or not it's an appropriate, reasonable

23   fee.

24         There is, as far as I can tell, no calculation here

25   for the likelihood -- how many law firms were involved in this

1    case?

2            MR. VIANALE:  Just three.

3            THE COURT:  Excuse me?

4            MR. VIANALE:  Three.

5            THE COURT:  -- for the likelihood that there was some

6    sort of duplication of effort by three different law firms

7    doing the same case.  And it seems to me there must have been.

8    Another reason why I want the actual time sheets, the actual

9    records submitted to us.

10            Let's do that first.  We'll wrestle with this issue

11   of -- and I don't raise this issue of the shareholders out of

12   thin air.  I've got a letter in there from an 86-year-old

13   shareholder who is absolutely mortified that her company that

14   she invested her money in is going to pay you close to a

15   million dollars for a case that took less than a year and at

16   which there was no evidentiary hearing whatsoever.  For

17   paperwork.  She's mortified.  She's got a right to have some

18   input into this process.

19            How long will it take you to submit those materials?

20            MR. VIANALE:  The backup for our --

21            THE COURT:  All of the backup records.

22            MR. VIANALE:  Not very long, your Honor.  A week.

23            THE COURT:  I'm sorry?

24            MR. VIANALE:  A week.

25            THE COURT:  All three?

```
 1            MR. HURST:  Yes, your Honor.

 2            MR. VIANALE:  One of us is going to be away.  Could

 3    we have two weeks, your Honor?

 4            THE COURT:  Sure.

 5            Sir, what did you have to say?

 6            MR. FRANK:  Thank you, your Honor.

 7            THE COURT:  Identify yourself completely for the

 8    record, please.

 9            MR. FRANK:  Absolutely.  My name is Theodore H.

10    Frank.  I'm a shareholder.

11            THE COURT:  The last name is Frank?

12            MR. FRANK:  My last name is Frank.

13            THE COURT:  Okay.

14            MR. FRANK:  And I know when I worked on the 27th

15    floor, when I heard pro se, I would think somebody who was

16    going to complain about gold-fringed flags.  So I wanted to

17    show the Court that I'm an attorney.  I'm an elected member of

18    the American Law Institute.  And I'm here because there are

19    severe problems with this settlement that I object to as a

20    shareholder.  One of those is procedural, three of them are

21    substantive.  I'll take them in turn.

22            With respect to the notice, the notice was woefully

23    inadequate.  They did not send me notice until June 23rd, two

24    days before the deadline for objections.  I did not receive it

25    until June 28th.  Now, they argue, well, that's okay because
```

1    he's a shareholder who holds his shares through a broker.  But

2    none of the cases they cite in support of the proposition that

3    you can treat those shareholders as second-class citizens

4    suffice -- stand for the proposition that you can ignore them

5    entirely.  All of those cases just simply said that if the

6    attorneys have performed their notice obligations with due

7    diligence, the fact that the broker engaged in unreasonable

8    delay does not make the notice improper.  But that's not what

9    happened here.

10        My broker did send them the names and addresses very

11    promptly.  And they sat on it another five days.  And then

12    they sent out the notice.  They did not ask the broker -- they

13    knew they had a settlement on April 28th.  They did not ask

14    the broker for the names and addresses until June 1st.  They

15    sat on that for 35 days.  Even if you go by the May 11th

16    approval of the preliminary -- the preliminary approval, they

17    sat on it for 21 days.

18        If you look at the cases they cite, the Fidel case

19    notice was sent out 46 days before the hearing, rather than

20    the 24 days here.  The DeJulius case out of the Tenth Circuit,

21    the notice was sent to the brokers two days after the

22    preliminary approval.  In the Torrisi case, the brokers held

23    on to the names and addresses for two months.  None of those

24    cases are -- all of those cases are distinguishable from what

25    we have here.

```
 1              And if the Court were to go farther and say it's okay
 2    to completely set up your notice system so that shareholders
 3    who hold their shares in a broker's name are effectively going
 4    to be frozen out, that would violate the Supreme Court's
 5    holdings on what constitutes adequate notice.
 6              And I'll note that the notice provision does not
 7    satisfy their own case law, Torrisi, which says was notice
 8    adequate to flush out whatever objections might reasonably be
 9    raised.  And it clearly wasn't because the objections we have
10    here are from, let's face it, mostly the crackpots, the person
11    who is asking for the two and a half million dollars.
12              THE COURT:  You don't think he's entitled to that
13    either?
14              MR. FRANK:  I'll go out on a limb and say he doesn't
15    deserve two and a half million dollars.
16              I was able to file a quasi substantive objection in
17    24 hours -- literally less than 24 hours after I got -- opened
18    up my mailbox and found out that my objection was due three
19    days ago.  And I would have liked to have had more time, but
20    plaintiffs' lawyer said, no, you're -- you can't object at
21    all.
22              MR. VIANALE:  That's untrue, your Honor.
23              MR. FRANK:  He said you can send it in to the Court
24    and we'll see what the Court says, whether you're allowed to
25    object.
```

1        MR. VIANALE:  Thank you.

2        MR. FRANK:  Which effectively meant that I had to get

3    it in as early as possible.

4        And I -- you know, I would have liked to have had

5    time to research some of these issues a bit more thoroughly,

6    like the -- for example, the interrelationship between 23(h)

7    and 23.1.  They claim that 23(h) doesn't apply at all under a

8    23.1 setting.  I'm not so sure that that's true, but I haven't

9    had time to research it.  I can't raise it here.  I've been

10   prejudiced in that way.

11       But let me raise some of the issues that I can raise.

12   And the fact of the matter is that this settlement is

13   worthless to the class.  And we know that it's worthless to

14   the class because in their complaint, the plaintiff said there

15   are no damages here.  We know that it's worthless to the

16   class.  And they say, well, but the plaintiffs -- excuse me --

17   the defendants say that the settlement benefits Sears.  Well,

18   we know that the defendants don't really believe that because

19   they settled this case on April 28th, and they didn't file a

20   disclosure with the SEC.  The Court preliminarily approved the

21   settlement on May 11th, and they didn't file a disclosure at

22   the SEC.

23       So there are one of two possibilities here.  Either

24   the defendants are in violation of the securities laws because

25   they did not disclose a material change in circumstances in

1   the business or this wasn't material at all.  And if it's not

2   material at all, it's not a material benefit to the class.

3   Where -- where is the benefit to the class?

4        Well, how did the market react?  On June 4th the

5   press release came out and the stock dropped $3.  Now, I'm not

6   going to claim that the stock dropped $3 because of the press

7   release.  That would require, you know, some financial

8   analysis that I have not had time to conduct.  But it does

9   show that this isn't a slam-dunk question, whether or not this

10  wonderful lawsuit that the plaintiffs have engaged in out of

11  the goodness of their hearts has had benefit to the

12  corporation.  At least it's a questionable fact.  And they

13  haven't adduced any evidence in support of it.

14       Well, they say but there's the problem of if there

15  was a Clayton Act violation, there could be all these adverse

16  consequences.  Well, what are those adverse consequences?  And

17  I had a colleague of mine make some phone calls and do some

18  research.  And the number of fines that the Obama

19  administration has issued for interlocking directorate

20  violations is zero dollars.  The number of fines that the Bush

21  administration issued for interlocking directorate violations,

22  zero dollars.  Well, what about the Clinton administration?

23  No.  Zero dollars.  Bush?  Zero dollars.  Reagan?  Zero

24  dollars.  I didn't check Carter.  But going back 30 years, the

25  FTC, DOJ, they don't issue fines for this.  What do they do?

1  They go to the corporation and they say we think you have an

2  interlocking directorate problem; please fix it.

3          THE COURT:  How often do they do that?

4          MR. FRANK:  Not very often, your Honor, but I don't

5  have an exact number on that.  I apologize.

6          So there's no benefit to the class from this

7  settlement.

8          The only benefit that they say is, well, we threw a

9  director off the board and he can't participate anymore.  But,

10 your Honor, as a matter of simple economics, if you have a

11 choice between chocolate, vanilla and strawberry or if you

12 have a choice between chocolate and vanilla, you're always

13 better with the first one, even if you might not want the

14 strawberry.  At a minimum you cannot be worse off with having

15 more choices for directors than less choices.

16         So we have no evidence of benefit.  We have evidence

17 that it hurt the shareholders, that it hurt the corporation.

18 Why should shareholders agree to this?

19         And I think you raised an interesting point:  What

20 would the shareholders pay on the market for this?  And this

21 goes to something I mentioned in the brief about the fiduciary

22 duty to the clients.  And it also goes to 23.1(a).  Are the

23 representatives here adequate and representative of the

24 shareholders as a whole?  And, your Honor, if the attorneys

25 went to a shareholders' meeting and said here's our

1    proposition; we think that there's some breach of fiduciary

2    duty among the appointment of directors and it hasn't caused

3    you any damage and it's not going to cause you any damage in

4    the future, but we'd like to engage in what Mr. Vianale calls

5    a very, very expensive litigation to correct this problem that

6    isn't causing you any damage and we'd like to get paid close

7    to a million dollars for it and have the shareholders spend a

8    lot of money on Wachtell Lipton and a Chicago law firm and

9    have directors distracted by this litigation; what do you, the

10   shareholders, want?  And, keep in mind, you shareholders,

11   you've already elected these directors to the board, already

12   knowing what their resumes were, by a 99.9 plus percent

13   figure.  And I think the shareholders will say get out of

14   here; we're not spending a dime on that; we don't want that

15   kind of lawsuit.  That's just churning.

16          THE COURT:  But that's not really the issue here, is

17   whether the shareholders would want to hire them to conduct

18   this litigation.  The issue is what would the shareholders be

19   willing to pay for these types of services, which is a

20   slightly different question; that is, what are the services

21   that they're offering --

22          MR. FRANK:  I agree that it's a slightly different

23   issue.  But I think the issue, would the shareholders, X and

24   Z, want to bring this litigation, I think the answer is very

25   clearly no.

1          THE COURT:  Let's assume that they wanted to bring

2     this litigation.  What would they be willing to pay this law

3     firm to do it?  That's the market analysis that I think the

4     case law calls for.

5          MR. FRANK:  Then I think the correct answer there is

6     zero because this is not a lawsuit that helps the company.

7     And there's no evidence that it's helped the company.  All the

8     evidence is is that this is a lawsuit that the lawyers engaged

9     in for their own benefit at the expense of their client, the

10    shareholders, or the expense of their putative client.

11          There's one last issue, and that's whether the

12    settlement is collusive.  And there are indicia of collusion

13    here.  The first indicia is this clear sailing clause.  And

14    that's the Weinberger case in the First Circuit and many other

15    cases citing Weinberger; that when you have a clear sailing

16    clause, you've got to look at it a little bit more closely

17    because, you know, why is it that -- you know, what is it that

18    the plaintiffs' attorneys gave up to get that clear sailing

19    clause?  Why is it that the defendants are paying to do that?

20          And the second issue here is the alleged -- the

21    lawsuit alleges a no damage breach of fiduciary duty by the

22    directors at the expense of the corporation and shareholders.

23    And the settlement has the shareholders paying for the

24    attorneys' fees to correct this problem.

25          Now, it's possible that it might be covered by the

1    directors' and officers' insurance.  The settlement agreement

2    isn't clear on that.  But there is a backstop in there that

3    says that Sears will pay this; that it will come out of my

4    funds as a shareholder to pay the attorneys for this lawsuit

5    alleging a director's breach of fiduciary duty.  And I would

6    submit that that is at least a little bit collusive between

7    the directors and the plaintiffs' attorneys at the expense of

8    the shareholders.

9          One last point regarding the benefits of the

10   settlement.  This is a lawsuit for no damages, and they've

11   shown no indication on how there might be damages in the

12   future.  So how is it that the settlement is beneficial?  If

13   there's a breach of fiduciary duty --

14         THE COURT:  But you're just calling into question the

15   basis behind the Act.  It could be that the Act is totally

16   bogus, but that's not for us to decide.  The Act says this is

17   something that's bad and you have a right to challenge it.

18         MR. FRANK:  But --

19         THE COURT:  You can argue that it's not.  You can

20   argue that it isn't.  And if you can convince Congress that

21   that's true, they'll change the law.  But until you do that,

22   that's a given here.

23         MR. FRANK:  Your Honor, but that's not -- it's not a

24   law for the benefit of the shareholders.  And this is one of

25   the issues I would have loved to have had more time to

1   research.  But this goes to the question of antitrust injury,

2   right?  This is something to protect competition, to protect

3   Sears and Jones Apparel from colluding somehow to split up the

4   market for ladies' wear, so nobody has alleged that that's

5   actually happened here.  That's something at the expense of

6   consumers.  That's something shareholders would want.  They

7   would love to have some sort of arrangement whereby prices go

8   up and the company makes more profit at the expense of

9   consumers.

10          So, you know, leaving it -- I'm not asking the Court

11  to reevaluate the merits of Section 8.  I'm asking the Court

12  to say why is this being brought on behalf of shareholders

13  when there's no damage to the shareholders and there's no

14  future damage to the shareholders.  And if -- they can't have

15  it both ways is the point I'd like to make.  They can't say

16  that by curing this breach of fiduciary duty, there are

17  benefits but there were no costs from the original breach of

18  fiduciary duty.  So either there are damages to the class from

19  the breach of fiduciary duty -- alleged breach of fiduciary

20  duty or there are benefits to the shareholders from the

21  alleged cure of the -- from the cure to the alleged breach of

22  fiduciary duty.  But you can't have it where neither of those

23  is true.

24          I'm happy to answer any questions you might have,

25  your Honor.

 1          THE COURT:  No, no questions.

 2          Does anyone else wish to speak?

 3          MR. VIANALE:  Your Honor, I'd like to respond to just

 4   a couple of points.

 5          THE COURT:  Sure.

 6          MR. VIANALE:  About the disclosure of the settlement,

 7   Mr. Frank said it wasn't disclosed until some much later time.

 8   The settlement was disclosed in an SEC filing on April 7 or

 9   April 8.  And the existence of a -- of the memorandum of

10   understanding was disclosed in that SEC filing.

11          Secondly, the next day there was a full-page

12   article -- or half-page article in the Wall Street Journal

13   about that filing that appeared in the C section and talked

14   about Section 8, Mr. Crowley, Ms. Reese.  That was done all in

15   early April.  I think it was April 8th.  So what he said on

16   that point is factually incorrect.

17          With respect to the notice to shareholders, we think

18   that the notice, as I said earlier, was okay.  It was

19   constitutionally valid.  But, nevertheless, to remove this

20   article -- argument entirely, we would be prepared to send a

21   postcard to those shareholders who held the stock in nominee

22   name, that is, those shareholders who were notified after the

23   first wave on June 1.  And we have drawn up the language that

24   we would propose to tell them.  It essentially would tell them

25   that -- we would ask your Honor to put off the settlement

1    hearing for another day, give them another day for objections

2    and advise them to go to the original notice that they

3    received on how to object or that they could obtain another

4    copy of the notice by simply downloading it or calling the

5    notice administrator.

6          THE COURT:  How many notices are we talking about?

7    How many shareholders?

8          MR. VIANALE:  I think roughly 49 to 50,000.  And

9    we've drawn up language --

10         THE COURT:  Is it likely that a substantial number of

11    those people, like Mr. Frank here, didn't actually receive the

12    notice until after the date for filing objections had passed?

13         MR. VIANALE:  It's possible, your Honor.  Not that I

14    think that's the standard.  The cases say actual notice isn't

15    required.  But it's possible.  And so to cure that, to remove

16    that as a problem, to remove that as an argument -- I don't

17    think constitutionally it's an issue, but rather than litigate

18    and argue that, we think we can cure it with a postcard.

19         THE COURT:  Do you agree?  Can that be cured with a

20    postcard?

21         MR. FRANK:  If it gives the class time to file

22    objections, then I would agree that that would cure it.

23         THE COURT:  It makes sense to me.  It makes sense to

24    me.

25         MR. KING:  Your Honor, this is Chris King on behalf

1    of the director defendants.

2          There's one thing that Mr. Vianale said -- just said

3    that I would like to disagree with.  I actually don't believe

4    that a majority of the people did not receive notice until

5    after the deadline.  The vast bulk of the mailings to the

6    people who held through nominees and who did not provide the

7    names or addresses to Sears were mailed out in advance of the

8    deadline.  And so that portion of what Mr. Vianale said I

9    don't agree with.

10         However, the defendants will not object to the

11   postcard notice approach that Mr. Vianale has suggested.  We

12   have no objection to that.

13         And, your Honor, I do have a couple of points that I

14   would like to be heard on or just at least address, before the

15   Court concludes, from Mr. Frank's comments.

16         THE COURT:  Go ahead.

17         MR. KING:  Thank you.

18         First of all, your Honor, I do want to take exception

19   to the suggestion there is any -- there's been any collusion

20   here.  This was an extremely hard-fought, vigorously contested

21   case, wholly at arm's length, by very reputable counsel on the

22   defense side.  And there was absolutely no collusion here.

23         Second, the suggestion that Mr. Frank made that the

24   people who held through -- elected to hold their stock through

25   nominees instead of by registering their stock with the

 1   company were somehow frozen out of the notice process is not

 2   accurate.  In fact, your Honor's notice that your Honor

 3   approved and what was sent out specifically provides for

 4   notice to be given to those nominee holders, which it was; for

 5   those nominee holders within ten days to either send the

 6   notices out themselves, ask for copies of the notice so they

 7   can send them out or give a list to the settlement

 8   administrators to send them out, which is the accepted way of

 9   proceeding according to all of the cases on this issue.  That

10   is exactly what happened, except that some of the nominee

11   holders -- some of the brokerage houses didn't comply with

12   that ten-day period.

13        THE COURT:  He's saying his brokerage house right

14   away gave you the information.  He still got his late.  Isn't

15   that what you're saying?

16        MR. FRANK:  My -- I don't know when my broker

17   received the mailing they got on the 1st.  It was a mailing.

18   I know that it was received by Garden City Group on the 18th.

19   Garden City Group then took that list and mailed out on the

20   23rd.

21        MR. KING:  Garden City Group has told me, your Honor,

22   that the date of the 23rd, which is the date that they gave to

23   Mr. Frank, was in error.  It was on the 22nd, one day's

24   difference.  But that's -- I believe that was three business

25   days.  So within three business days of having received

1    Mr. Frank's name from the broker, Garden City mailed it out.

2    And that's well within the time frame that's been approved by

3    other courts.

4            The last thing that I would like to just mention to

5    your Honor is your Honor earlier during the hearing made a

6    suggestion that there might be some type of a further

7    communication with the shareholders with respect to the

8    attorneys' fees question.  Now, we've agreed not to take a

9    position on the plaintiffs' request for fees.  We're not doing

10   that.

11           However, I must say that on behalf of the director

12   defendants and the company, if there is going to be some type

13   of a subsequent communication with the shareholders that has a

14   cost involved with it, we will want to be heard on that issue

15   at that time to address the issue of cost because obviously

16   additional cost to our clients -- and I'm sure Ms. Hudson

17   would say additional costs to the company -- are something

18   that are of concern to us.  And so I would just like to

19   reserve our rights on that if I may.

20           THE COURT:  Okay.

21           Anything else by anyone?

22           MR. VIANALE:  Your Honor, I have a formal notice that

23   we would propose to send to the shareholders.  If I could hand

24   it up?

25           THE COURT:  The postcard notice?

1         MR. VIANALE:  Yes.

2         THE COURT:  Sure.

3    (Tendered.)

4    (Brief pause.)

5         THE COURT:  It appears pretty straightforward to me.

6  Have you seen it?

7         MR. FRANK:  I have not seen it.

8         THE COURT:  Give Mr. Frank a copy.

9         MR. FRANK:  I'm sorry?

10        MR. VIANALE:  I'm sorry.  Here, I have a copy for

11 him.

12   (Brief pause.)

13        MR. FRANK:  I mean, I think a lot would depend on the

14 dates.  As long as there is adequate time for shareholders.

15        THE COURT:  How much time do you think is adequate?

16        MR. FRANK:  Well, I mean, for example -- I mean, I

17 would say three weeks from the mailing date.  I don't know how

18 quickly they could get these mailed out.

19        MR. VIANALE:  Your Honor, I propose the following

20 dates:  The postcard would go out July 20th; that all

21 objections be served by August 20th.  And if your Honor had

22 another -- continue this fairness hearing to August 27th.

23        THE COURT:  Sounds adequate.

24        MR. FRANK:  I think so.

25        MR. KING:  No objection, your Honor.

1      MR. FRANK:  Independently, your Honor, I would just

2  like to apologize for the unintentional factual misstatement,

3  if it is indeed the case that there was an SEC filing before

4  April 28th.  I only looked back to April 28th because that's

5  when the settlement agreement was signed.  And it perhaps

6  should have but did not occur to me that there might have been

7  a filing before there was an actual agreement.

8      THE COURT:  Those dates are fine as far as I'm

9  concerned.  And I think the notice is straightforward and

10  works quite well.  Now that we have the Internet and people

11  can download the original notices from there, that seems to me

12  to take care of the problem that Mr. Frank has raised.

13      I have one other question I would like to ask with

14  respect to the attorneys' fees.  It's really -- I want to ask

15  of the attorneys for Sears and for the defendants, which is:

16  When you agreed to this cap that you would not object to on

17  attorneys' fees, this 900-and-some thousand dollars, what was

18  the basis for agreeing to that?

19      MR. KING:  It was a negotiated compromise amount,

20  your Honor.  There was a negotiation.

21      THE COURT:  But on what did you base your position in

22  that negotiation as to what an appropriate amount of fees

23  would be?  Did you, for example, compare it to the fees you

24  were charging your client for the same litigation?

25      MR. KING:  We did consider what -- what the cost was

1   that was being sought.  And we also considered that amount in

2   light of the potential cost if we didn't settle and what they

3   might recover if the case went through the hearing, as well as

4   what -- what Sears would spend.

5           THE COURT:  That doesn't actually answer my question

6   though.  Did you consider it in light of the charges that you

7   had actually submitted to your client up to that point in

8   time?

9           MR. KING:  I do not recall actually pulling our fees

10  at that time, no, your Honor.

11          THE COURT:  I would like to see your fees for a

12  comparison.  Submit those.

13          MR. KING:  All right.  And may we just -- may we

14  provide you with a total by firm or a -- how -- how does your

15  Honor wish to receive that?

16          THE COURT:  Well, I'd like to have the actual

17  documents.

18          MR. KING:  The time records?

19          THE COURT:  Yes, same thing they're submitting.

20  Another clear indicator of what the market might feel is an

21  appropriate fee for these services.  Something for us to look

22  at.

23          MR. KING:  Your Honor, I don't want to be -- to

24  create a problem here, but there will be for -- many of us

25  make very detailed time records, and there will be privilege

```
 1   issues associated with that.  May we --

 2            THE COURT:  That's always a problem.

 3            MR. KING:  -- redact them or --

 4            THE COURT:  It's always a problem because, frankly,

 5   when we review these things, if the description in the time

 6   record is not sufficient to tell us precisely what's being

 7   charged for, it doesn't really do us any good.  And you have

 8   your concern about the privilege issues.  I would think that

 9   you would be able to redact any mentions of anything having to

10   do with any form of work product, opinions, conclusions,

11   strategies and still be able to include the substantive

12   subject matter to which the charge relates.  That's what I

13   would ask you to do.

14            MR. KING:  Your Honor, may we submit those in camera,

15   your Honor?

16            THE COURT:  Do you have any objection?

17            MR. FRANK:  I would prefer if Sears not spend money

18   on redactions.  So as long as the totals are available, I

19   don't have any problem.

20            THE COURT:  Do you have any objection?

21            MR. VIANALE:  No, your Honor.

22            MR. KING:  That certainly is our preference, your

23   Honor.  We don't want to redact them either.

24            THE COURT:  Fine.  You can submit them in camera.

25            MR. KING:  Thank you, your Honor.
```

```
 1            MR. VIANALE:  Can we do the same, your Honor?  Can we
 2    do the same with ours?
 3            THE COURT:  Yes.
 4            MS. HUDSON:  Just to be clear, your Honor.  You
 5    wanted the billing records for the individual director
 6    defendants' counsel, as well as nominal defendant Sears
 7    Holdings Corporation?
 8            THE COURT:  Yes.
 9            So I think we'll give this a 60-day status hearing.
10    You may be able to get everything done by then.
11            THE CLERK:  September 9th.
12            THE COURT:  September 9th.
13            MR. VIANALE:  Your Honor, the previous schedule we
14    were going to put on the postcard had a fairness hearing
15    August 27th.  So that contemplated us being -- all of us being
16    back here then.
17            THE COURT:  Well, we've got until August 28th on this
18    new postcard going out for the filing of objections.  Should
19    we have a status hearing before then?
20            MR. VIANALE:  August 20th, your Honor, is for the
21    objections.
22            THE COURT:  August 20th?
23            MR. VIANALE:  Yes, your Honor.
24            THE COURT:  All right.  Let's try August 27th.
25            THE CLERK:  10:00 a.m.?
```

1          THE COURT:  10:30.

2          MR. KING:  So the postcard should request a fairness

3   hearing August 27, 10:30?

4          THE COURT:  Yes.  We'll try to make that work.

5          MR. KING:  Thank you, your Honor.

6          THE COURT:  Thank you all.

7          MR. FRANK:  Thank you, your Honor.

8          THE COURT:  Have a good day.

9                      *    *    *    *    *

10

11   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

12

13
     */s/ Nancy C. LaBella*                    *July 16, 2010*
14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25